USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/30/15__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re DNTW CHARTERED
ACCOUNTANTS SECURITIES
LITIGATION

**MEMORANDUM
OPINION & ORDER**

13 Civ. 4632 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a securities class action brought under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"). Plaintiffs purchased shares of Subaye, Inc. and allege that the Company's auditor – Defendant DNTW Chartered Accountants, LLP – "knowingly turned a blind eye and deliberately disregarded . . . obvious fraud at Subaye," (Corrected Class Action Cmplt. (Dkt. No. 21) ¶ 5), and "issued . . . materially false and misleading 'clean' audit reports for Subaye's fiscal 2009 and 2010 financial statements." (Id. ¶ 3)

Defendants have moved to dismiss (see Dkt. No. 22), arguing that Plaintiffs have not sufficiently alleged (1) scienter under Section 10(b), or (2) a misrepresentation by DNTW. (Def. Br. (Dkt. No. 24) at 1-3) Defendants further argue that because the Section 10(b) claim fails, the control person claim under Section 20(a) must also be dismissed. (Id. at 3)

For the reasons stated below, Defendants' motion will be granted.

## BACKGROUND[1]

### I.    FACTUAL BACKGROUND

Subaye is a Delaware corporation that purports to provide computing, online media, and advertising services in China. (Corrected Class Action Cmplt. (Dkt. No. 21) ¶ 23) Between 2008 and 2010, Subaye reported "tremendous revenue growth," claiming that its sales in China grew from \$29.1 million in 2008 to \$47.9 million in 2009. (Id. ¶¶ 41-45) While overall revenue dropped to \$39.1 million in 2010, Subaye reported that its online business grew by 46.4%. (Id.) In 2011, however, fraud at the Company was uncovered, and it became clear that Subaye's claims about its revenue and customer base were untrue. (Id. ¶¶ 55-60, 85-93) After fraud allegations against Subaye and its Chief Financial Officer – James Crane – were made, the value of Subaye's stock fell significantly, causing injury to Plaintiffs. (Id. ¶¶ 87-91, 101) Soon after, Crane resigned as CFO. (Id. ¶ 87) In May 2013, the SEC sued Subaye and Crane for securities fraud. (Id. ¶¶ 28, 30)

In 2009 and 2010, while the fraud was ongoing at Subaye, Defendant DNTW served as the Company's auditor. (Id. ¶¶ 3-4) During this period, DNTW performed two audits of Subaye's financial statements. (Id.) Those audits covered 2008, 2009, and the fiscal year ending September 30, 2010. (Id. ¶¶ 32-33) DNTW issued "clean" audit reports on both occasions. (Id.)

One asset listed in Subaye's 2009 audited financial statements was \$8.1 million in "Deposits for Purchase of Inventoriable Assets." (Id. ¶ 49) This "amount [was] equal to about 17% of the company's revenue for [2009], or 25 times . . . Subaye's cash balance [at] the end of

---

[1] The following facts are drawn from the Corrected Class Action Complaint (Dkt. No. 21) and are presumed true for purposes of resolving Defendants' motion to dismiss. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

2009." (Id.) Crane represented that the cash deposits had been placed with three consumer goods companies to ensure "just in time" delivery of certain products Subaye sold online. Subaye sold no consumer goods, however. (Id. ¶ 49) Crane assured DNTW that the deposits were refundable in full, but the contracts Subaye provided to DNTW did not state that the deposits were refundable. (Id. ¶ 50) DNTW nonetheless accepted Crane's explanation concerning the alleged $8.1 million in cash deposits, and the audited financial statements DNTW prepared for 2009 and 2010 show the $8.1. million in alleged cash deposits as an asset on Subaye's balance sheet. (Id.) By the end of the 2010 fiscal year, however, two of the cash deposit contracts had been cancelled, only $1.9 million of the cash deposits had been refunded, and $3.4 million of the cash deposits had been written off. (Id.)

In its "2010 audited financial statements, Subaye [also] reported $22.1 million in marketing expense – equal to more than half of [its] revenue." (Id. ¶ 46) Of this $22.1 million, Subaye had initially recorded on its balance sheet $18.8 million as "Cash Held in Trust." (Id. ¶ 47) During the 2010 audit, Crane told DNTW that this $18.8 million in cash "was being held by Subaye's third-party sales agents to be used for marketing and promotional expenses, as directed by the Company." (Id.) DNTW "asked Crane to produce documents to support the existence of this cash, . . . [but] Crane could not produce any bank account statements, receipts or other direct proof." (Id.) "Instead, Crane produced contracts, said to have been signed by the third-party sales agents, purporting to show a relationship between them and Subaye." (Id.) Crane later admitted to DNTW that Subaye had no control over the cash allegedly being held by its third-party sales agents, however, and he "conceded that these amounts could not be identified as 'cash.'" (Id.) "Subaye ultimately agreed to expense the $18.8 million as 'mark[et]ing promotions' in [its] 2010 10-K." (Id.)

3

On December 23, 2010, Subaye dismissed DNTW as its auditor and hired

PricewaterhouseCoopers Hong Kong ("PWC"). (Id. ¶ 54) "PWC was able to quickly identify

that Subaye's financial statements were misstated." (Id. ¶ 55) On April 7, 2011, PWC

announced its resignation as Subaye's auditor. (Id. ¶ 57) PWC

> cited numerous reasons that called into question the legitimacy of . . . Subaye's business, namely inadequate documentation to substantiate the purported $22.1 million in marketing expense that purportedly was being held by Subaye's sales agents; the existence of customers; commonalities between customers and vendors (i.e., customers were also vendors); and despite the millions of [dollars of] revenue generated no evidence [that] Subaye [had] paid business tax in China.

(Id.)

On March 24, 2011, market analyst GeoInvesting issued a report asserting that

Subaye's claimed 1,500 employees did not exist, that Subaye's alleged "cloud" products did not

exist, and that Subaye's stock was likely worthless. (Id. ¶¶ 58-59)

The SEC concluded that (1) Subaye had no verifiable assets; (2) the people

Subaye claimed as customers had no such relationship with it; (3) the Company's offices were

empty; and (4) Subaye was "an imaginary business." (Id. ¶ 60)

Despite the apparent magnitude of Subaye's fraud, DNTW had issued "clean"

audit reports for the Company's financial statements for 2008, 2009, and fiscal year 2010. (Id.

¶¶ 32-33) In DNTW's 2009 audit report, DNTW states that it conducted the audit

> in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits include consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstance, but not for expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles

4

used and significant estimates made by management, as well as evaluating the
overall financial statement presentation. We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present
fairly, in all material respects, the consolidated financial position of Subaye, Inc.
and Subsidiaries, a Delaware corporation, as of September 30, 2009 and 2008,
and the results of its consolidated operations and comprehensive income,
stockholders' equity, and cash flows for the[se] years . . . , in conformity with
accounting principles generally accepted in the United States of America.

(Id. ¶ 32)

DNTW's 2010 audit report makes the same representations, except in its last

paragraph, which references only the Company's operations and cash flows:

In our opinion, the consolidated financial statements referred to above present
fairly, in all material respects, the consolidated financial position of Subaye, Inc.
and Subsidiaries, a Delaware corporation, as of September 30, 2010 and 2009,
and the results of its operations and cash flows for the years then ended, in
conformity with accounting principles generally accepted in the United States of
America.

(Id. ¶ 33)

Plaintiffs claim that the DNTW's audit reports are "materially false and

misleading," in that they "falsely state[] that DNTW had conducted its audits of Subaye 'in

accordance with standards of the Public Company Accounting Oversight Board (United States)

["PCAOB"].'" (Id. ¶¶ 3-4) The PCAOB requires an auditor to, inter alia, (1) obtain sufficient

"knowledge to . . . understand[] . . . the events, transactions, and practices that . . . may have

[had] a significant effect on the financial statements"; (2) obtain "reasonable assurance" about

whether the financial statements are free of material misstatement due to error or fraud; (3)

obtain sufficient evidence through inspection, observation, inquiries, and confirmations to afford

a "reasonable basis" for an opinion on the audited financial statements; (4) exercise due

professional care; and (5) establish direct communication between itself and those entities or

5

individuals providing confirmations of financial transactions to "minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses." (Id. ¶¶ 77-81)

According to Plaintiffs, instead of following these standards, DNTW "knowingly turned a blind eye and deliberately disregarded the obvious fraud at Subaye." (Id. ¶¶ 4-5) "Contrary to basic PCAOB standards, DNTW merely relied on the representations of . . . Crane for the audits of Subaye, even after Crane provided conflicting and implausible explanations for the purported tens of millions of dollars of cash generated by Subaye's purported sales." (Id. ¶ 6) DNTW relied on Crane's representations even though it knew "that Subaye had ineffective disclosure and internal controls" and that Subaye management's representations concerning Subaye's financial condition were not reliable. (Id. ¶ 7)

DNTW "never obtained third-party verification of Subaye's sales and revenue and the purported cash generated from Subaye's multi-million in sales." (Id. ¶ 8) Nor did DNTW conduct any on-site examinations of Subaye's business or assign any Chinese-speaking auditors to its audits of Subaye, despite the fact that Crane was the only English-speaking member of Subaye's management and Subaye conducted all of its business in China. (Id. ¶ 83)

According to Plaintiffs, "[h]ad DNTW conducted its audits of Subaye in accordance with PC[AO]B standards, DNTW could not have issued the clean audit reports that it did and DNTW would have readily discovered Subaye as a fraud." (Id. ¶ 10)

6

## II.    PROCEDURAL HISTORY

Plaintiffs filed this action on July 3, 2013. (Cmplt. (Dkt. No. 1))  On September 3, 2013, Plaintiffs moved to consolidate a related action[2] with the instant action and for the appointment of lead plaintiff and lead counsel. (Dkt. No. 10)  Defendants did not oppose consolidation; accordingly, this Court ordered the two cases consolidated for all purposes (Dkt. No. 17) and permitted Plaintiffs to file a Consolidated Class Action Complaint. (Dkt. No. 16)  That complaint was filed on December 2, 2013. (Dkt. No. 18)  Plaintiffs later filed a Corrected Class Action Complaint (the "Complaint"). (Dkt. No. 21)

On March 18, 2014, Defendants moved to dismiss. (Dkt. No. 22)  Defendants argue that Plaintiffs have not sufficiently alleged (1) scienter under Section 10(b), or (2) a misrepresentation by DNTW. (Def. Br. (Dkt. No. 24) at 1-3)  Defendants further argue that because the Section 10(b) claim fails, the control person claim under Section 20(a) must also be dismissed. (Id. at 3)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    General Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning

---

[2] The other action is Dyke v. DNTW Chartered Accountants, LLP and John and Jane Does 1-5, No. 13 Civ. 5120 (PGG).

Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678. "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).

## B. Heightened Pleading Standard for Securities Fraud Complaints

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012). First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Thus, a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976))). "To qualify as 'strong' within the intendment of [the PSLRA], . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

9

## II.    PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED SCIENTER

To establish scienter, "[t]he PSLRA requires plaintiffs to state with particularity

. . . the facts evidencing . . . the defendant's intention 'to deceive, manipulate, or defraud.'"

Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst, 425 U.S. at 194).  As discussed below, "[t]he

pleading requirements for auditor scienter are particularly stringent." Special Situations Fund III

QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 426 (S.D.N.Y. 2014)

(citing In re Advanced Battery Techs., Inc. Sec. Litig., No. 11 Civ. 2279 (CM), 2012 WL

3758085, at *15 (S.D.N.Y. Aug. 29, 2012) ("ABAT I") ("Courts in this District have repeatedly

recognized [that] "[t]he standard for pleading auditor scienter is demanding.") (alterations in

original)).

"Plaintiffs may allege scienter by either (1) showing the defendants' motive and

opportunity to perpetrate fraud, or (2) alleging 'strong circumstantial evidence of conscious

misbehavior or recklessness.'" Iowa Pub. Emp. Ret. Sys. v. Deloitte & Touche LLP, 919 F.

Supp. 2d 321, 331 (S.D.N.Y. 2013) (quoting In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d

370, 384 (S.D.N.Y. 2007)) (emphasis in original) ("IPERS").

### A.    Motive and Opportunity

"Motive . . . c[an] be shown by pointing to 'the concrete benefits that could be

realized' from one or more of the allegedly misleading statements or nondisclosures; opportunity

c[an] be shown be alleging 'the means' used and the 'likely prospect of achieving concrete

benefits by the means alleged.'" S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108

(quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)).  However, "the

current state of the case law holds . . . that no independent auditor would risk ruination of its

reputation for the fees it would collect in order to suppress fraud." Whalen v. Hibernia Foods

10

PLC, No. 04 Civ. 3182 (HB), 2005 WL 1799370, at *2 (S.D.N.Y. Aug. 1, 2005). Accordingly,

"a generalized economic interest in professional fees is insufficient to establish an accounting

firm's motive to commit fraud." In re Philip Serv. Corp. Sec. Litig., 383 F. Supp. 2d 463, 470

(S.D.N.Y. 2004).

Here, Plaintiffs claim that DNTW had a motive to commit securities fraud

because of the significance of the Subaye account to its business. (Pltf. Br. (Dkt. No. 27) at 17)

Plaintiffs allege that

> [t]he Subaye audit engagement was the centerpiece of DNTW's expansion into
> public company accounting and amounted to a large portion of DNTW's public
> company book of business. DNTW had only five other publicly traded company
> audit engagements. . . .
>
> The fees earned from the Subaye engagement were by far the largest amount
> earned by DNTW from public company audits during the class period. For
> Subaye's fiscal year ended 2009, DNTW earned over $200,800 and in 2010
> DNTW earned $120,000 in fees. For 2008, DNTW earned over $184,000 in fees
> from Subaye. For DNTW's five other public company engagements, the fees
> DNTW earned ranged from $29,000 to $84,000.

(Corrected Class Action Cmplt. (Dkt. No. 21) ¶¶ 21-22)

Courts in this Circuit have repeatedly found allegations of this sort insufficient to

establish motive. See In re Philip Serv., 383 F. Supp. 2d at 470 ("Absent specific facts

warranting a departure from the assumption that Deloitte was acting in its economic self-interest,

I decline to infer fraudulent intent merely from its desire to keep a client."); In re China Organic

Sec. Litig., No. 11 Civ. 8623 (JMF), 2013 WL 5434637, at *9 (S.D.N.Y. Sept. 30, 2013)

("Although it may be plausible that an auditor would go to great lengths to keep a client's

business – even, in some circumstances, by deliberately misstating its finances – such an

assumption, by itself, is insufficient to show motive."); see also ABAT I, 2012 WL 3758085, at

11

*15 ("Ordinarily, independent outside auditors will have no motive to commit fraud." (quotation omitted)).

Assuming arguendo that revenue from the Subaye account amounted to a large percentage of the fees DNTW earned from auditing public companies, Plaintiffs make no allegations about the significance of the Subaye account relative to DNTW's entire portfolio of clients. In any event, Plaintiffs have cited no authority for the proposition that fees from a significant audit client are sufficient to establish an auditor's motive to commit securities fraud. "Notwithstanding the financial importance of the [Subaye] account to [DNTW], it strains reason that [DNTW] would jeopardize its reputation, subject itself to civil and/or criminal liability, and risk substantial financial penalties simply because it wanted to keep [Subaye] as a client." In re Philip Serv., 383 F. Supp. 2d at 470. Because the Complaint's allegations contain no "specific facts warranting a departure from the assumption that [DNTW] was acting in its economic self-interest," id., Plaintiffs have not sufficiently alleged motive.

## B.  **Conscious Misbehavior or Recklessness**

### 1.  **Applicable Law**

To establish scienter by conscious misbehavior or recklessness "in the securities fraud context [requires] far 'more than a misapplication of accounting principles.'" IPERS, 919 F. Supp. 2d at 333 (quoting SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). "At the pleading stage, the reckless conduct alleged by plaintiffs must be, 'at a minimum, "highly unreasonable[,] . . . represent[ing] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."'" Id. at 333-34 (quoting Tabor v. Bodisen Biotech, Inc., 579 F. Supp. 2d 438, 449 (S.D.N.Y. 2008) (quoting In re Carter-Wallace, Inc., Sec. Litig.,

12

220 F.3d 36, 39 (2d Cir. 2000))) (alterations in original). "Such recklessness cannot be shown with [accounting standard] violations alone." In re China Organic, 2013 WL 5434637, at *10.

"[F]or an independent auditor, the conduct 'must, in fact approximate an actual intent to aid in the fraud being perpetrated by the audited company,' as, for example, when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant must have been aware of them." In re Advanced Battery Techs., Inc., No. 14 Civ. 1410, 2015 WL 1321233, at *4 (2d Cir. Mar. 25, 2015) (quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)) (citing Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 160-61 (2d Cir. 2012)); see also Rothman, 220 F.3d at 98 ("[f]or recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company" (quotations omitted)). "Mere 'allegations of GAAP violations or accounting irregularities,' or even a lack of due diligence, will not state a securities fraud claim absent 'evidence of corresponding fraudulent intent." In re Advanced Battery Techs., 2015 WL 1321233, at *4 (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)) (citing S. Cherry St., 573 F.3d at 112).

Where a plaintiff attempts to plead scienter by conscious misbehavior, the allegations must demonstrate "deliberate illegal behavior" by the auditor. In re China Organic, 2013 WL 5434637, at *10. The auditor's behavior "also must reflect accounting judgments that 'no reasonable accountant would have made . . . if confronted with the same facts." IPERS, 919 F. Supp. 2d at 333 (quoting Price Waterhouse, 797 F. Supp. at 1240). Accordingly, to hold an auditor liable for securities fraud, the accounting practices employed by the auditor must be "'so

13

deficient that the audit amounted to no audit at all,' meaning 'an egregious refusal to see the obvious, or to investigate the doubtful.'" Id. (quoting Price Waterhouse, 797 F. Supp. at 1240).

Another "crucial limitation to . . . recklessness-based scienter is the insufficiency of allegations of 'fraud by hindsight.'" IPERS, 919 F. Supp. 2d at 334 (quoting Novak, 216 F.3d at 309). The allegations may not "rest[] on a post hoc ergo propter hoc approach to the complex issue of scienter." Id. at 335.

"'[A] complaint might reach [the] "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" In re China Organic, 2013 WL 5434637, at *10 (quoting In re Longtop Fin. Techs. Ltd. Sec. Litig., 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012) (quoting In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008))) (second alteration in original). However, courts have declined to "extend 10b-5 liability to instances where an auditor fails to investigate certain red flags that, while themselves are not indicative of actual fraud, could, if pursued, lead to the discovery of fraud." Iowa Pub. Emp. Ret. Sys. v. Deloitte & Touche LLP, 973 F. Supp. 2d 459, 465 (S.D.N.Y. 2013) ("IPERS II").

### 2.    Analysis

Plaintiffs offer three theories as to how DNTW's conduct meets the standard for recklessness. First, Plaintiffs claim that DNTW's audits were so deficient as to amount to no audit at all. (Pltf. Br. (Dkt. No. 27) at 12-14) Second, Plaintiffs claim that DNTW ignored "red flags" that should have put it on notice of Subaye's fraud. (Id. at 14-16) Third, Plaintiffs claim that the fraud was so obvious that DNTW must either have known about the fraud or known that its audits were inadequate. (Id. at 16-17)

14

### a.   DNTW's Audits Were Not So
### Deficient as to Amount to No Audit At All

Plaintiffs argue that DNTW's audits amount to no audit at all because DNTW

(1) was aware of deficiencies in Subaye's internal controls but nevertheless "rel[ied] solely on

Crane even after Crane provided inconsistent, improbable, and unsupported explanations"

concerning Subaye's financial condition;[3] (2) assigned no Chinese speaking auditors to the

Subaye audit team; (3) did not conduct on-site examinations of Subaye's Chinese offices; and (4)

did not independently confirm the existence of Subaye's customer base. (Id. at 12-14)

The Complaint itself demonstrates, however, that DNTW did not "rely solely on

Crane" (id. at 13) in its audits of Subaye, but rather sought independent corroboration of Crane's

representations. For example, in connection with a balance sheet entry showing $18.8 million in

"Cash Held in Trust," DNTW "asked Crane to produce documents to support the existence of

this cash, said to be held by sales agents for development." See Corrected Class Action Cmplt.

(Dkt. No. 21) ¶ 47. "Crane could not produce any bank account statements, receipts or other

direct proof[,] [but] [i]nstead . . . produced contracts, said to have been signed by the third-party

sales agents, purporting to show a relationship between them and Subaye." (Id.) DNTW

rejected this proof, however, and continued to "ask[] questions designed to corroborate the

---

[3] DNTW was not retained to evaluate Subaye's internal controls, of course, and both the 2009 and 2010 audit reports explicitly state that DNTW is offering no opinion concerning the effectiveness of the Company's internal controls. (Corrected Class Action Cmplt. (Dkt. No. 21) ¶¶ 32-33) Moreover, even where an auditor learns of deficiencies in a company's internal controls, and that company is later found to have engaged in fraud, the auditor's knowledge of deficiencies in the company's internal controls does not, standing alone, render the auditor liable for securities fraud. See Longtop, 939 F. Supp. 2d at 388 ("Plaintiffs argue, at core, that identifying risk factors at a company ultimately discovered to be engaged in fraud should expose auditors to legal liability. But this is not the law. . . . Plaintiffs' argument would vitiate the [Exchange Act's] purpose, by exposing an auditor to liability when that auditor identifies risk factors at a company later found to be engaged in fraud, but fails to catch its fraud.").

15

existence of the cash and Subaye's control over it." (Id.) In response to DNTW's continued questions, Crane eventually admitted that Subaye did not control this cash, and "agreed to expense the $18.8 million[.]" (Id.)

Similarly, in connection with an alleged $8.1 million asset characterized as "Deposits for Purchase or Inventoriable Assets," DNTW obtained contracts between Subaye and vendors addressing these cash deposits. (Id. ¶¶ 49-50)

Accordingly, in connection with both of these episodes – which constitute core allegations of the Complaint – DNTW did not "rely solely" on Crane's representations. To the contrary, in each instance DNTW sought independent corroboration. Moreover, any suggestion that DNTW had "an actual intent to aid in [Subaye's] fraud," In re Advanced Battery Techs., 2015 WL 1321233, at *4, is significantly undercut by the fact that, with respect to the $18.8 million in "marketing expenses," (1) DNTW would not permit Subaye to carry these funds as cash on its balance sheet absent corroborating documentation; and (2) as a result of DNTW's apparently persistent questions, the alleged $18.8 million asset was converted to an expense.

The Complaint pleads ample facts demonstrating that DNTW was negligent. Undoubtedly, DNTW should have made greater efforts to verify Subaye's revenue claims, more carefully analyzed the vendor contracts Subaye produced, employed Chinese-speaking auditors, and conducted on-site examinations. If DNTW had taken such steps, it may well have uncovered fraud at Subaye. But negligent conduct is not sufficient to hold an auditor liable for securities fraud, even where competent work might have led to discovery of the fraud. See id. at *4-6 (in securities fraud context, necessary recklessness is "'not merely a heightened form of negligence'" or "even a lack of due diligence"; "conditional allegations of the sort 'that [a defendant] "would" have learned the truth' about a company's fraud 'if [it] had performed the

16

due diligence it promised' are generally insufficient to establish the requisite scienter" (quoting Novak, 216 F.3d at 312; S. Cherry St., 573 F.3d at 110, 112) (alterations in original)); Special Situations Fund, 33 F. Supp. 3d at 429 (auditor scienter requires "'a state of mind approximating actual intent, and not merely a heightened form of negligence'" (quoting S. Cherry St., 573 F.3d at 109) (emphasis in original)).

Plaintiffs must show deliberate illegal behavior or recklessness "'approximat[ing] an actual intent to aid in the fraud being perpetrated by the audited company,'" In re Advanced Battery Techs., 2015 WL 1321233, at *4 (quoting Rothman, 220 F.3d at 98), and DNTW's audit procedures were not so deficient as to demonstrate this mental state.

### b. Plaintiffs Have Not Established Scienter Under a "Red Flags" Theory

Plaintiffs argue that DNTW ignored "red flags" that should have put it on notice of Subaye's fraud. The alleged "red flags" are (1) Crane's "inconsistent and implausible responses"; (2) Subaye's continued revenue growth while its business was in transition, and relatively small cash balance; (3) the $18.8 million in marketing expenses, and (4) the $8.1 million in refundable cash deposits. (Pltf. Br. (Dkt. No. 27) at 14-15) Plaintiffs' arguments concerning these alleged "red flags" mirror their arguments as to why DNTW's audits amount to no audit at all: because DNTW knew of deficiencies in Subaye's internal controls, DNTW "could not simply rely on Subaye senior management (i.e. Crane) for a complete and accurate picture of the company." (Id.)

As discussed above, however, DNTW did not simply rely on Crane with respect to the "marketing expenses" and the "refundable deposits"; instead, DNTW sought corroboration and required Subaye to change its financial statements in instances where it concluded that Subaye's corroboration was insufficient. See Corrected Class Action Cmplt. (Dkt. No. 21)

17

¶¶ 47, 50. As also discussed above, DNTW may well have been negligent in not performing a more thorough investigation, but a negligent audit is not sufficient to establish deliberate illegal behavior.

Plaintiffs must demonstrate "'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" Special Situations Fund, 33 F. Supp. 3d at 429 (quoting S. Cherry St., 573 F.3d at 109) (emphasis in original)). Accordingly, when proceeding under a "red flags" theory, plaintiff must show that the auditor disregarded "red flags" that are themselves indicative of actual fraud. See IPERS II, 973 F. Supp. 2d at 465 (declining to "extend 10b-5 liability to instances where an auditor fails to investigate certain red flags that, while themselves are not indicative of actual fraud, could, if pursued, lead to the discovery of fraud"); see also In re Advanced Battery Techs., 2015 WL 1321233, at *6 ("conditional allegations of the sort 'that [a defendant] "would" have learned the truth' about a company's fraud 'if [it] had performed the due diligence it promised' are generally insufficient to establish the requisite scienter" (quoting S. Cherry St., 573 F.3d at 112) (alterations in original)). It is not "enough to 'merely alleg[e] that the auditor had access to the information by which it could have discovered the fraud.'" Stephenson v. PricewaterhouseCoopers, LLP, 768 F. Supp. 2d 562, 573 (S.D.N.Y. 2011) (quoting In re Tremont Sec. Law, State Law and Ins. Litig., 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010)) (alterations in original); see Stephenson, 768 F. Supp. 2d at 573 ("Thus[,] the Second Circuit has affirmed the dismissal of a complaint 'replete with allegations that [a firm] "would" have learned the truth as to those aspects of the [fraudulent] funds if [it] had performed the "due diligence" it promised' and that '[i]f [the firm] had asked various questions earlier, it would have further questioned the [fraudulent fund's] financial records or

18

recognized the need to ask further questions.'" (quoting S. Cherry St., 573 F.3d at 112) (alterations in original).

Here, the alleged "red flags" – Crane's explanations, Subaye's revenue growth during a period of transition, its relatively small cash balance, its $18.8 million in marketing expenses, and the $8.1 million in "refundable deposits" – are not themselves indicative of actual fraud. Indeed, according to the Complaint, "[t]hese machinations were used by Subaye to mask the nonexistent sales from . . . Subaye's claimed operations. As Subaye's fake revenues grew, it had to come up with these explanations for the lack of cash on Subaye's books." (Corrected Class Action Cmplt. (Dkt. No. 21) ¶ 51) Accordingly, devices such as the $18.8 million in marketing expenses and the $8.1 million in "refundable deposits" were allegedly employed precisely because they disguised rather than disclosed Subaye's fraud.

At best, Plaintiffs' allegations suggest that if DNTW had taken additional steps to corroborate Crane's statements, it would have uncovered Subaye's fraud. Plaintiffs state as much in their papers. See Pltf. Br. (Dkt. No. 27) at 13 ("Had DNTW attempted to independently contact the sales agents, verify revenue, verify the cash, check the company's inventory, or even attempt to validate the existence of its customers, . . . these efforts would have revealed that Subaye was a complete sham."). The alleged "red flags" cited by Plaintiffs do not demonstrate that DNTW intended to aid Subaye's fraud or that it "disregard[ed] signs of fraud so obvious that [it] must have been aware of them." In re Advanced Battery Techs., 2015 WL 1321233, at *4 (citing Gould, 692 F.3d at 160-61).

### c.   The Alleged Magnitude and Obviousness of Subaye's Fraud Do Not Establish Scienter

Plaintiffs also contend that the magnitude and obviousness of Subaye's fraud demonstrate DNTW's scienter. This argument relies on the same claim that DNTW did no more

19

than "accept[] Crane's representations at face value." (Pltf. Br. (Dkt. No. 27) at 16) This is not true, for the reasons discussed above.

"To the extent Plaintiffs argue that [PWC, GeoInvesting, and the SEC] quickly unearthed the fraud, and thus it was easily discoverable, this argument suffers from hindsight bias." Special Situations Fund, 33 F. Supp. 3d at 434. While it may be obvious in hindsight that Subaye was committing fraud, the subsequent discovery of fraud does not shed light on DNTW's state of mind at the time of its audits. As discussed above, the circumstances that Plaintiffs allege DNTW actually knew of during its audits do not establish scienter. The magnitude of the fraud that was ultimately revealed – and the alleged alacrity with which others discovered the fraud – do not demonstrate that DNTW engaged in deliberate illegal behavior or acted with recklessness approximating an intent to aid Subaye's fraud.

\*　　\*　　\*　　\*

The inference that DNTW was engaged in deliberate illegal activity or acted with recklessness approximating intent to aid Subaye's fraud is not as compelling as the competing inferences. It is more plausible that DNTW was itself fooled, or that DNTW simply performed shoddy, negligent audits. Accordingly, Plaintiffs have not sufficiently alleged scienter. See Tellabs, 551 U.S. at 314 ("To qualify as 'strong' within the intendment of [the PSLRA], . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."); see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must

consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). Accordingly, Plaintiffs' Section 10(b) claim will be dismissed.[4]

## III.   CONTROL PERSON LIABILITY

The Complaint includes a claim for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities law." Rombach, 355 F.3d at 177-78. Because the Court finds that Plaintiffs have not adequately pled a violation of the securities laws, their Section 20(a) claim will be dismissed.

## IV.   PLAINTIFFS WILL BE GRANTED LEAVE TO AMEND

Plaintiffs have requested leave to amend. (Pltf. Br. (Dkt. No. 27) at 21)  Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts "ha[ve] broad discretion in determining whether to grant leave to amend." Gurary v. Winehouse, 235 F.3d 793, 801 (2d Cir. 2000). Moreover, "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." ATSI Communications, Inc., 493 F.3d at 108.

Leave to amend may properly be denied, however, in cases of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Forman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City of N.Y., No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19,

---

[4] Having found that Plaintiffs have not adequately alleged scienter, this Court does not reach the issue of whether Plaintiffs have adequately pled a misrepresentation by DNTW.

2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)).

While it appears unlikely that Plaintiffs will be able to plead facts that meet the demanding standard for auditor liability in a securities fraud action, this Court cannot find on the present record that any proposed amendment would be futile. Accordingly, the Court will grant Plaintiffs leave to file an amended complaint.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to terminate the motion (Dkt. No. 22). Any amended complaint is to be filed by April 27, 2015.

Dated: New York, New York
       March 29, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge

22