UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re DNTW CHARTERED
ACCOUNTANTS SECURITIES
LITIGATION

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **3|22|16**

13 Civ. 4632 (PGG)

**MEMORANDUM
OPINION & ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

This is a securities class action brought under Sections 10(b) and 20(a) of the

Securities and Exchange Act of 1934 (the "Exchange Act"). Plaintiffs purchased shares of

Subaye, Inc. and allege that the Company's auditor – Defendant DNTW Chartered Accountants,

LLP – "knowingly turned a blind eye and deliberately disregarded . . . obvious fraud at Subaye,"

(Consolidated Amended Class Action Cmplt. (Dkt. No. 33) ¶ 5) (hereinafter Amended

Complaint), and "issued materially false and misleading 'clean' audit reports for Subaye's fiscal

year 2009 and 2010 financial statements." (Id. ¶ 3)

Pending before the Court is Defendants' motion to dismiss the Amended

Complaint. (Dkt. No. 47) For the reasons stated below, Defendants' motion will be granted.

## BACKGROUND[1]

### I.     FACTS

Subaye is a Delaware corporation that purports to provide computing, online

media, and advertising services in China. (Amended Cmplt. (Dkt. No. 33) ¶ 28) Between 2008

and 2010, Subaye reported "tremendous revenue growth," claiming that its sales in China grew

from $29.1 million in 2008 to $47.9 million in 2009. (Id. ¶¶ 74(g)(i)-(iii)) While overall

---

[1] The following facts are drawn from the Amended Complaint (Dkt. No. 33), and are presumed
true for purposes of resolving Defendants' motion to dismiss. See Kassner v. 2nd Ave.
Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

revenue dropped to $39.1 million in 2010, Subaye reported that its online business grew by 46.4%.  (Id. ¶ 74(g)(iv))

In 2011, fraud at the Company was uncovered, and it became clear that Subaye's claims about its revenue and customer base were false.  (Id. ¶¶ 81-82, 106)  After fraud allegations against Subaye and its Chief Financial Officer – James Crane – were made, the value of Subaye's stock fell significantly, causing losses to Plaintiffs.  (Id. ¶¶ 102-07, 117)  Soon after, Crane resigned as CFO.  (Id. ¶ 103)  In May 2013, the SEC sued Subaye and Crane for securities fraud.  (Id. ¶¶ 33, 35)

In 2009 and 2010, while the fraud was ongoing at Subaye, Defendant DNTW served as the Company's auditor.  (Id. ¶ 3)  During this period, DNTW performed audits of Subaye's financial statements.  (Id.)  Those audits covered 2008, 2009, and the fiscal year ending on September 30, 2010.  (Id. ¶¶ 37–38)  DNTW issued "clean" audit reports for these time periods.  (Id.)

Subaye's 2009 audited financial statements include an $8.1 million asset labeled "Deposits for Purchase of Inventoriable Assets."  (Id. ¶¶ 9(b), 51-53)  Crane represented to DNTW that these cash "deposits were made with consumer good companies to ensure 'just in time' delivery of products sold from Subaye.com," and assured DNTW that the deposits were fully refundable.  (Id. ¶¶ 52, 74(c))  Subaye was "not a seller of consumer products," however, and Crane never provided DNTW with sufficient evidence to demonstrate that the cash actually existed.  (Id.)  DNTW nonetheless accepted Crane's explanation concerning the alleged $8.1 million in cash deposits.  (Id. ¶ 74(c))  In 2010, Subaye wrote off the $2.1 million remaining balance of this alleged asset.  (Id. ¶ 52)

In 2010, Subaye recorded an $18.8 million asset on its balance sheet as "Cash

2

Held in Trust." (Id. ¶ 49) During the 2010 audit, Crane told DNTW that this $18.8 million in cash "was held by Subaye's third-party sales agents to be used for marketing and promotional expenses, as directed by the Company." (Id.) DNTW "asked Crane to produce documents to support the existence of this cash, . . . [but] Crane could not produce any bank account statements, receipts or other direct proof." (Id. ¶ 50) "Instead, Crane produced contracts, said to have been signed by the third-party sales agents, purporting to show a relationship between them and Subaye." (Id.) Crane later admitted to DNTW, however, that Subaye had no control over the cash allegedly being held by its third-party sales agents. (Id.) DNTW "ultimately determined that there was not sufficient evidence to account for the $18.8 million as an asset and insisted that it instead be booked as a marketing expense." (Id. ¶ 50(a))

On December 23, 2010, Subaye dismissed DNTW as its auditor and hired PricewaterhouseCoopers Hong Kong ("PWC"). (Id. ¶ 78) "PWC was able to quickly identify that Subaye's financial statements were misstated." (Id. ¶ 79) On April 7, 2011, PWC announced its resignation as Subaye's auditor. (Id. ¶ 81) PWC

> cited numerous reasons that called into question the legitimacy of Subaye's business, namely inadequate documentation to substantiate the purported . . . marketing expense that purportedly was being held by Subaye's sales agents; the existence of customers; commonalities between customers and vendors (i.e., customers were also vendors); and despite the millions of [dollars of] revenue generated no evidence [that] Subaye [had] paid business tax in China.

(Id.)

On March 24, 2011, market analyst GeoInvesting issued a report asserting that Subaye's claimed 1,500 employees did not exist, that Subaye's alleged "cloud" products did not exist, and that Subaye's stock was likely worthless. (Id. ¶¶ 83-84)

Despite the apparent magnitude of Subaye's fraud, DNTW had issued "clean" audit reports for the Company's financial statements for 2008, 2009, and fiscal year 2010. (Id.

3

¶¶ 37–38)  In DNTW's 2009 audit report, DNTW states that it conducted the audit

> in accordance with the standards of the Public Company Accounting Oversight
> Board (United States). Those standards require that we plan and perform the
> audits to obtain reasonable assurance about whether the financial statements are
> free of material misstatement. The Company is not required to have, nor were we
> engaged to perform, an audit of its internal control over financial reporting. Our
> audits include consideration of internal control over financial reporting as a basis
> for designing audit procedures that are appropriate in the circumstance, but not for
> expressing an opinion on the effectiveness of the Company's internal control over
> financial reporting. Accordingly, we express no such opinion. An audit includes
> examining, on a test basis, evidence supporting the amounts and disclosures in the
> financial statements. An audit also includes assessing the accounting principles
> used and significant estimates made by management, as well as evaluating the
> overall financial statement presentation. We believe that our audits provide a
> reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present
> fairly, in all material respects, the consolidated financial position of Subaye, Inc.
> and Subsidiaries, a Delaware corporation, as of September 30, 2009 and 2008,
> and the results of its consolidated operations and comprehensive income,
> stockholders' equity, and cash flows for the[se] years . . . , in conformity with
> accounting principles generally accepted in the United States of America.

(Id. ¶ 37) (emphasis omitted)

DNTW's 2010 audit report makes the same representations, except in its last

paragraph, which references only the Company's operations and cash flows:

> In our opinion, the consolidated financial statements referred to above present
> fairly, in all material respects, the consolidated financial position of Subaye, Inc.
> and Subsidiaries, a Delaware corporation, as of September 30, 2010 and 2009,
> and the results of its operations and cash flows for the years then ended, in
> conformity with accounting principles generally accepted in the United States of
> America.

(Id. ¶ 38)

Plaintiffs claim that DNTW's audit reports are "materially false and misleading,"

in that they "falsely state[] that DNTW had conducted its audits of Subaye 'in accordance with

standards of the Public Company Accounting Oversight Board (United States) ("PCAOB").'"

(Id. ¶¶ 3–4)

4

The PCAOB requires an auditor to, inter alia, (1) obtain "reasonable assurance" about whether the financial statements are free of material misstatement (id. ¶ 37); (2) obtain sufficient competent evidence to afford a "reasonable basis" for an opinion concerning the audited financial statements (id. ¶ 47); (3) exercise due professional care (id. ¶ 56); (4) establish direct communication between itself and those entities or individuals providing confirmations of financial transactions to "minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses" (id. ¶ 54); and (5) supervise assistants that it hires to conduct an audit. (Id. ¶ 46).

According to Plaintiffs, instead of following these standards, DNTW "knowingly turned a blind eye and deliberately disregarded the obvious fraud at Subaye." (Id. ¶¶ 4–5) "DNTW knew . . . that Subaye had ineffective disclosure and internal controls" and therefore "knew that it could not simply rely on Subaye's management to provide [it] with documents or information in the performance of its audit of Subaye." (Id. ¶ 6) Nonetheless, Plaintiffs allege that DNTW "relied almost exclusively on Subaye and its management, particularly Crane." (Id. ¶ 10) In particular, DNTW "relied solely on purported bank statements that were provided to DNTW by Subaye's management" rather than "testing Subaye's cash through confirmations to banks." (Id. ¶ 8)

DNTW did not, for example, confirm the existence of (1) the $8.1 million in cash that Subaye listed as "Deposits for Purchase of Inventoriable Assets" (id. ¶¶ 9(b), 51-53), or (2) the $18.8 million that Subaye attempted to record as "Cash Held in Trust." (Id. ¶¶ 9(a), 49-50). DNTW also "performed no further procedures . . . after discovering" that: (1) ten accounts receivable confirmations were received within eleven days after the requests for confirmation had been mailed out (id. ¶¶ 9(e), 61); (2) four accounts receivable confirmations were faxed from

5

Subaye's bookkeeper and not from Subaye's customers (id. ¶¶ 9(c), 55); (3) $6.7 million of Subaye's $7.1 million cash balance as of September 30, 2010[2] was deposited into Subaye's account during the last week of fiscal year 2010 (id. ¶ 9(d)); and (4) "Subaye kept changing its business model, but . . . continued to increase sales." (Id. ¶ 9(f)). Finally, DNTW did not have any Chinese-speaking auditors on staff (id. ¶ 10), and did not properly supervise its contracted China-based assistants. (Id. ¶ 46).

According to Plaintiffs, PWC uncovered the fraud at Subaye with ease when it utilized audit procedures required by PCAOB standards. (Id. ¶¶ 11-12)

In May 2013, the SEC brought an enforcement proceeding against Subaye and Crane alleging securities fraud. (Id. ¶¶ 33-35) The SEC concluded that (1) Subaye had no verifiable assets; (2) the people Subaye claimed as customers had no such relationship with it; (3) Subaye's offices were empty; and (4) Subaye was "'an imaginary business.'" (Id. ¶ 82)

In May 2014, the SEC issued a cease and desist order[3] against DNTW partners Bryce Walker and Spence Walker. (Id. ¶¶ 40-44) Bryce Walker served as the firm's engagement partner for DNTW's audit of Subaye's 2010 financial statements. (Id. ¶ 23) Spence Walker served as the firm's engagement partner for DNTW's audits and reviews of Subaye's financial statements for 2007 through the third quarter of 2010. (Id. ¶ 24) Spence Walker was

---

[2] The Amended Complaint twice states that Subaye's cash balance was $7.1 million "as of September 30, 2012." (See id. ¶¶ 9(d), 74(e)) The correct date is September 30, 2010, however, given that Plaintiffs allege that Subaye received $6.7 million of the total $7.1 million cash balance "during the final week of fiscal year 2010." (Id.) The correct date is stated elsewhere in the Amended Complaint. See id. ¶ 60 ("$6.7 million of Subaye's $7.1 million cash balance as of September 30, 2010 resulted from deposits into Subaye's accounts during the last seven days of September").

[3] See Order Instituting Public Administrative and Cease-And-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order. (Am. Cmplt. (Dkt. No. 33), Ex. 1)

6

also the quality review partner for Subaye's 2010 audit. (Id.) The SEC (1) directed Bryce and Spence Walker to cease and desist from any future violations of Section 13(a) of the Exchange Act and Rule 13a-1, and Regulation SX-Rule-2-02(b)(1); (2) prohibited both men from appearing or practicing before the SEC for a period of time; and (3) imposed fines, with joint and several liability. (Id. ¶¶ 63-66)

## II.    PROCEDURAL HISTORY

Plaintiffs filed this action on July 3, 2013. (Cmplt. (Dkt. No. 1))  On September 3, 2013, Plaintiffs moved to consolidate a related action[4] with the instant action and for the appointment of lead plaintiff and lead counsel. (Dkt. No. 10)  Defendants did not oppose consolidation; accordingly, this Court ordered the two cases consolidated for all purposes (Dkt. No. 17), and permitted Plaintiffs to file a Consolidated Class Action Complaint. (Dkt. No. 16) That complaint was filed on December 2, 2013. (Dkt. No. 18)  On December 13, 2013, Plaintiffs filed the Corrected Consolidated Class Action Complaint (the "Prior Complaint"). (Dkt. No. 21)

On March 18, 2014, Defendants moved to dismiss the Prior Complaint. (Dkt. No. 22)  Defendants argued that Plaintiffs had not sufficiently alleged (1) scienter under Section 10(b), or (2) a misrepresentation by DNTW. (Def. Br. (Dkt. No. 24) at 5–8)  Defendants further argued that because the Section 10(b) claim fails, the control person claim under Section 20(a) must also be dismissed. (Id. at 7-8)

On March 30, 2015, this Court granted Defendants' motion to dismiss the Prior Complaint on the grounds that Plaintiffs had not sufficiently alleged scienter under Section 10(b). [5]  In re DNTW Chartered Accountants Sec. Litig., 96 F. Supp. 3d 155, 163-69 (S.D.N.Y.

---

[4] The other action is Dyke v. DNTW Chartered Accountants, LLP and John and Jane Does 1-5, 13 Civ. 5120 (PGG).

[5] Having found that Plaintiffs had not adequately alleged scienter, this Court did not reach the

2015). This Court granted Plaintiffs leave to file an amended complaint. Id. at 170.

On May 11, 2015, Plaintiffs filed the Amended Complaint (Dkt. No. 33), and on August 20, 2015, Defendants filed a motion to dismiss the Amended Complaint. (Dkt. No. 47) Defendants argue that Plaintiffs have still not sufficiently alleged scienter under Section 10(b), and that because the Section 10(b) claim fails, the control person claim under Section 20(a) must also be dismissed. (Def. Br. (Dkt. No. 48) at 6-7)

## DISCUSSION

## I.    LEGAL STANDARD

### A.    Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the

issue of whether Plaintiffs had adequately pled a misrepresentation by DNTW. In re DNTW Chartered Accountants Sec. Litig., 96 F. Supp. 3d 155, 169 n.4 (S.D.N.Y. 2015).

elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).

## B. Heightened Pleading Standard for Securities Fraud Complaints

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012). First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud. . . ." Fed. R. Civ. P. 9(b). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b).

The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)). Thus, a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"

9

Rombach, 355 F.3d at 170 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976))). "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

## II.    PLAINTIFFS' ALLEGATIONS OF SCIENTER IN THE AMENDED COMPLAINT ARE INSUFFICIENT

To establish scienter, "[t]he PSLRA requires plaintiffs to state with particularity . . . the facts evidencing . . . the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst, 425 U.S. at 194). As discussed below, "[t]he pleading requirements for auditor scienter are particularly stringent." Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 426 (S.D.N.Y. 2014)

10

(citing In re Advanced Battery Techs., Inc. Sec. Litig., 2012 WL 3758085, at *15 (S.D.N.Y. Aug. 29, 2012) ("ABAT I") ("Courts in this District have repeatedly recognized [that] '[t]he standard for pleading auditor scienter is demanding.'")).

"Plaintiffs may allege scienter by either (1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging 'strong circumstantial evidence of conscious misbehavior or recklessness.'" Iowa Pub. Emp. Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013) ("IPERS") (emphasis in IPERS) (quoting In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 384 (S.D.N.Y. 2007)).

The Amended Complaint contains no substantial new allegations concerning Defendants' motive and opportunity to perpetrate fraud. Accordingly, the Court considers below whether Plaintiffs have proffered strong circumstantial evidence of conscious misbehavior or recklessness.

### A.    Conscious Misbehavior or Recklessness

#### 1.    Applicable Law

To establish scienter through proof of conscious misbehavior or recklessness requires "far 'more than a misapplication of accounting principles.'" IPERS, 919 F. Supp. 2d at 333 (quoting SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). "At the pleading stage, the reckless conduct alleged by plaintiffs must be, 'at a minimum, "highly unreasonable[,] . . . represent[ing] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."'" Id. at 333–34 (quoting Tabor v. Bodisen Biotech, Inc., 579 F. Supp. 2d 438, 449 (S.D.N.Y. 2008) (quoting In re Carter–Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000))) (alterations in IPERS). "Such recklessness cannot be shown with [accounting

11

standard] violations alone." In re China Organic, 2013 WL 5434637, at \*10 (S.D.N.Y. Sept. 30, 2013) (citing Stephenson v. PricewaterhouseCoopers, LLP, 768 F. Supp. 2d 562, 568 (S.D.N.Y. 2011) aff'd, 482 F. App'x 618 (2d Cir. 2012); In re Longtop Fin. Techs. Ltd. Sec. Litig., 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012)).

"[F]or an independent auditor, the conduct 'must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company,' as, for example, when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant must have been aware of them." In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) ("ABAT II") (quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000), and citing Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 160-61 (2d Cir. 2012)); see also Rothman, 220 F.3d at 98 ("For 'recklessness on the part of a non-fiduciary accountant' to satisfy securities fraud scienter, 'such recklessness must be conduct that is "highly unreasonable," representing an "extreme departure from the standards of ordinary care." It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company'" (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-21 (2d Cir. 1982))). "Mere 'allegations of GAAP violations or accounting irregularities,' or even a lack of due diligence, will not state a securities fraud claim absent 'evidence of corresponding fraudulent intent.'" ABAT II, 781 F.3d at 644 (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000), and citing S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 112 (2d Cir. 2009)).

Where a plaintiff attempts to plead scienter through allegations demonstrating conscious misbehavior, those allegations must show "deliberate illegal behavior" by the auditor. In re China Organic, 2013 WL 5434637, at \*10. The auditor's conduct "must reflect accounting judgments that 'no reasonable accountant would have made . . . if confronted with the same

12

facts,'" <u>see</u> <u>IPERS</u>, 919 F. Supp. 2d at 333 (quoting <u>Price Waterhouse</u>, 797 F. Supp. at 1240), and the accounting practices employed must be "'so deficient that the audit amounted to no audit at all,' meaning 'an egregious refusal to see the obvious, or to investigate the doubtful.'" <u>Id.</u> (quoting <u>Price Waterhouse</u>, 797 F. Supp. at 1240).

Another "crucial limitation to . . . recklessness-based scienter is the insufficiency of allegations of 'fraud by hindsight.'" <u>Id.</u> at 334 (quoting <u>Novak</u>, 216 F.3d at 309). The allegations may not "rest[] on a <u>post hoc ergo propter hoc</u> approach to the complex issue of scienter." <u>Id.</u> at 335.

"'[A] complaint might reach [the] "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" <u>In re China Organic</u>, 2013 WL 5434637, at *10 (quoting <u>In re Longtop Fin. Techs. Ltd. Sec. Litig.</u>, 910 F. Supp. 2d at 574 (quoting <u>In re IMAX Sec. Litig.</u>, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008))) (second alteration in <u>In re Longtop Fin. Techs. Ltd. Sec. Litig.</u>). However, courts have declined to "extend 10b–5 liability to instances where an auditor fails to investigate certain red flags that, while themselves . . . not indicative of actual fraud, could, if pursued, [have led] to the discovery of fraud." <u>Iowa Pub. Emp. Ret. Sys. v. Deloitte & Touche LLP</u>, 973 F. Supp. 2d 459, 465 (S.D.N.Y. 2013) ("IPERS II").

Defendants argue that – in evaluating whether Plaintiffs have sufficiently alleged scienter – this Court should consider only new allegations in the Amended Complaint, and should disregard allegations previously asserted in the Prior Complaint and repeated in the Amended Complaint. (Def. Reply Br. (Dkt. No. 51) at 5) In dismissing the Prior Complaint, this Court found that its allegations were insufficient to establish scienter. <u>See</u> <u>In re DNTW</u>

Chartered Accountants Sec. Litig., 96 F. Supp. 3d at 169 ("The inference that DNTW was engaged in deliberate illegal activity or acted with recklessness approximating intent to aid Subaye's fraud is not as compelling as the competing inferences. . . . Accordingly, Plaintiffs have not sufficiently alleged scienter." (citing Tellabs, 551 U.S. at 314)). Defendants note that under the law of the case doctrine, "'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages of the same case unless cogent and compelling reasons militate otherwise.'" In re LIBOR-Based Fin. Instruments Antitrust Litig., 27 F. Supp. 3d 447, 473 (S.D.N.Y. 2014) (quoting Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009), reconsideration denied, 2014 WL 6488219 (S.D.N.Y. Nov. 18, 2014)). Accordingly, Defendants argue that this Court should not reconsider any allegations that it previously found insufficient to establish scienter. (Def. Reply Br. (Dkt. No. 51) at 5)

In determining whether Plaintiffs have sufficiently alleged scienter, however, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23 (emphasis in Tellabs) (citing Abrams v. Baker Hughes Inc., 292 F.3d 424, 431 (5th Cir. 2002); Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002)); see also Athale v. SinoTech Energy Ltd., 2014 WL 687218, at *6 (S.D.N.Y. Feb. 21, 2014) ("The Court must examine the[] allegations both individually and in aggregate, keeping in mind that such allegations may lend support to an inference of scienter even if they are not, on their own, sufficient to establish it."); IPERS, 919 F. Supp. 2d at 331-32 ("[C]ourts must examine such red flags in the 'aggregate,' which prevents defendants from 'secur[ing] dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.'" (quoting In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007))). Accordingly,

14

this Court has considered all of the allegations in the Amended Complaint – whether repeated from the Prior Complaint or made for the first time – in determining whether Plaintiffs have sufficiently pled scienter.

### 2.    **Analysis**

Plaintiffs claim that DNTW (1) ignored "red flags" that should have put it on notice of Subaye's fraud (Pltf. Br. (Dkt. No. 52) at 7); (2) "failed to adjust [its] audit procedures in light of the red flags"; and (3) "actually eased [its] audit procedures" in violation of PCAOB standards.  (Id. at 8)

### a.    **Plaintiffs Have Not Established Scienter Under a "Red Flags" Theory**

In the Amended Complaint, Plaintiffs identify certain "red flags" of fraud that they previously asserted in the Prior Complaint.  These alleged "red flags" are:  (1) Subaye's "inconsistent and implausible explanations" regarding the cash generated by Subaye's business (Prior Cmplt. (Dkt. No. 21) ¶¶ 6, 52; Am. Cmplt. (Dkt. No. 33) ¶ 9(a)); (2) Subaye's relatively small cash balance, and its continued revenue growth while its business was in transition (Prior Cmplt. (Dkt. No. 21) ¶¶ 41-45; Am. Cmplt. (Dkt. No. 33) ¶ 74(g)); (3) the $8.1 million in refundable cash deposits (Prior Cmplt. (Dkt. No. 21) ¶¶ 49-50; Am. Cmplt. (Dkt. No. 33) ¶ 9(b)); and (4) the $18.8 million in cash, later booked as a marketing expense.  (Prior Cmplt. (Dkt. No. 21) ¶ 47; Am. Cmplt. (Dkt. No. 33) ¶¶ 49-50)

Plaintiffs also allege the following new "red flags" in the Amended Complaint: that (1) $6.7 million of Subaye's $7.1 million cash balance as of September 30, 2010 – the end of the fiscal year – was deposited into Subaye's account during the last week of September (Am. Cmplt. (Dkt. No. 33) ¶ 9(d)); (2) ten accounts receivable confirmations were received within eleven days after the requests for confirmation were mailed out (id. ¶ 9(e)); and (3) four accounts

15

receivable confirmations were faxed to DNTW by Subaye's bookkeepers rather than by Subaye's customers. (Id. ¶ 74(d)).

As to the $6.7 million deposited into Subaye's account in the last week of fiscal year 2010, Plaintiffs argue that "[m]aterial late-in-the-reporting period adjustments support a claim of scienter." (Pltf. Br. (Dkt. No. 52) at 22)  The Court acknowledges that a pattern of material transactions occurring at the end of a quarter or other reporting period can support a claim of scienter. See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) ("[P]laintiff alleges that [the auditor] ignored the fact that material amounts of advertising revenue came in at the end of each quarter just in time to permit [the client] to hit its advertising revenue targets.  Such late-in-the-quarter revenue recognition has been found sufficient to support a claim of scienter." (citing In re Homestore.com, Inc. Sec. Litig., 252 F. Supp. 2d 1018, 1044 (C.D. Cal. 2003) (finding that "the most significant of these red flags was the fact that on numerous occasions, major transactions took place within the last few days of the quarter"))).  Plaintiffs allege no such pattern here, however.  Instead, Plaintiffs point to one occasion in which a material amount of revenue was received at the end of a fiscal year.  Plaintiffs have cited no case suggesting that such a one-time event constitutes a "red flag" of fraud.

As to the accounts receivable confirmations, Plaintiffs argue that the quick return of all of these confirmations constitutes a "red flag", noting that Bryce Walker "recognized how unusual [it] was" for all audit confirmations to be returned so quickly. (Pltf. Br. (Dkt. No. 52) at 13)  Plaintiffs complain that Walker "fail[ed] to exercise the adequate level of professional skepticism that was required based on the circumstances" and "never performed additional procedures." (Am. Cmplt. (Dkt. No. 33) ¶ 61)  Plaintiffs also assert that the fact that four of the

16

accounts receivable confirmations were returned by Subaye's bookkeepers rather than by Subaye's customers was a "red flag" of fraud. (Id. ¶ 74(d))

To proceed under a "red flags" theory, however, Plaintiffs must show that DNTW disregarded "red flags" that are themselves "indicative of actual fraud." See IPERS II, 973 F. Supp. 2d at 465 (declining "to extend 10b–5 liability to instances where an auditor fails to investigate certain red flags that, while themselves . . . not indicative of actual fraud, could, if pursued, [have led] to the discovery of fraud"); see also Stephenson, 768 F. Supp. 2d at 573 ("[T]he Second Circuit has affirmed the dismissal of a complaint 'replete with allegations that [a firm] "would" have learned the truth as to those aspects of the [fraudulent] funds if [it] had performed the "due diligence" it promised' and that '[i]f [the firm] had asked various questions earlier, it would have further questioned the [fraudulent fund's] financial records or recognized the need to ask further questions.'" (quoting S. Cherry St., LLC, 573 F.3d at 112) (alterations in Stephenson)); In re Tremont Sec. Law, State Law & Ins. Litig., 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010) ("[M]erely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient." (citing Rothman, 220 F.3d at 98)).

Here, the manner in which the accounts receivable confirmations were returned to DNTW is not itself indicative of actual fraud. Plaintiffs in effect acknowledge this, when they criticize Bryce Walker for not exercising greater "professional skepticism" in connection with the confirmations. (Am. Cmplt. (Dkt. No. 33) ¶ 61) Asserting that someone should have exercised greater "professional skepticism" is not tantamount to saying that he or she ignored obvious indications of actual fraud, or engaged in conduct that approximates an actual intent to aid in fraud. Rothman, 220 F.3d at 98. At most, Plaintiffs' allegations regarding the confirmations suggest that if DNTW had exercised greater skepticism or performed further

17

procedures, it potentially could have discovered the fraud. Such allegations are not sufficient to allege scienter under a "red flags" theory, however.[6]

The new "red flags" alleged in the Amended Complaint – even when considered with the allegations drawn from the Prior Complaint – fall far short of the "especially stringent standard" for alleging conscious misbehavior or recklessness. Special Situations Fund III QP, L.P., 33 F. Supp. 3d at 429. The Amended Complaint does not sufficiently allege scienter under a "red flags" theory.

             **b.**      **DNTW's Audits Were Not So Deficient as to Establish Scienter**

Plaintiffs contend that DNTW's violation of PCAOB standards, and "loosen[ing] [of its] auditing procedures," resulted in audits that were so deficient as to establish scienter. (Pltf. Br. (Dkt. No. 52) at 7-8)

The Amended Complaint re-asserts the following alleged deficiencies in DNTW's audit procedures: (1) DNTW was aware of problems with Subaye's internal controls but nevertheless "relied almost exclusively on Subaye and its management, particularly Crane" (Prior Cmplt. (Dkt. No. 21) ¶¶ 6-7; Am. Cmplt. (Dkt. No. 33) ¶¶ 6, 10); and (2) DNTW had no Chinese-speaking auditors on staff. (Prior Cmplt. (Dkt. No. 21) ¶ 83; Am. Cmplt. (Dkt. No. 33) ¶ 10).

---

[6] Plaintiffs also assert that Bryce Walker and DNTW's China-based assistants have given inconsistent accounts as to the handling of the accounts receivable confirmations. (Am. Cmplt. (Dkt. No. 33) ¶ 9(c)) Plaintiffs state that "Bryce Walker testified to the SEC that it was DNTW's contracted assistants in China that handled these confirmations. However, those same assistants told the SEC they did not have any involvement with the accounts receivable confirmations." (Id.) Plaintiffs have pled that "DNTW's audit work papers contain copies of returned accounts receivable confirmations," however (id. ¶ 55), and the fact that there is "conflicting evidence of how those confirmations were sent out and received by the auditors" (id.) does not demonstrate that DNTW ignored obvious signs of fraud. See S. Cherry St., LLC, 573 F.3d at 109. Instead, the conflicting evidence supports an inference that DNTW performed a negligent and shoddy audit.

The Amended Complaint also contains the following new alleged deficiencies: (1) DNTW obtained bank statements from Subaye's management rather than from the bank beginning with the 2009 audit, "even though PCAOB standards state that audit evidence is more reliable when it is obtained from independent sources" (Am. Cmplt. (Dkt. No. 33) ¶ 8); and (2) DNTW inadequately supervised the contracted China-based assistants. (Id. ¶ 46) The Amended Complaint also notes that the SEC found that DNTW's audits were not conducted in accordance with PCAOB standards. (Id. ¶¶ 40-44)

Mere violation of accounting standards is not sufficient to establish scienter, however. See In re Lehman Bros. Sec. & Erisa Litig., 2015 WL 5514692, at *12 (S.D.N.Y. Sept. 18, 2015) ("GAAP violations, accounting irregularities, and a lack of due diligence are not sufficient" to establish scienter (citing ABAT II, 781 F.3d at 644)); In re Winstar Commc'ns, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) ("[G]eneral allegations regarding the existence of GAAP and GAAS violations and that the accounting firm was in possession of relevant documentation will not suffice to establish scienter" (citing Decker, 681 F.2d at 120)). Rather, plaintiffs must show conduct that "'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.'" Rothman, 220 F.3d at 98 (quoting Decker, 681 F.2d at 121). Allegations of accounting irregularities must therefore be accompanied by facts suggesting corresponding fraudulent intent. See id. ("Although the Complaint alleged that [the auditor] had violated various GAAP provisions, those allegations, 'without corresponding fraudulent intent,' do not suffice 'to state a securities fraud claim.'" (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996))); Athale, 2014 WL 687218, at *10 ("As Plaintiffs themselves recognize, 'allegations of GAAP violations or accounting irregularities, standing

alone, are insufficient,' and must be 'coupled with evidence of corresponding fraudulent intent' in order to state a securities fraud claim." (quoting Novak, 216 F.3d at 309)).

      To meet this standard, "a plaintiff must proffer facts suggesting far more than simply an audit that could have been better. Rather, the audit must have been so shoddy that it was a 'pretend' audit – an audit that in effect was not performed at all." In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d 230, 248 (S.D.N.Y. 2014) (citing Rothman, 220 F.3d at 98). Plaintiffs' allegations do not come close to meeting this demanding standard.

      With respect to Plaintiffs' claim that DNTW "relied almost exclusively on Subaye and its management" (Am. Cmplt. (Dkt. No. 33) ¶ 10) – including by obtaining bank statements from Subaye's management rather than the bank (id. ¶ 8) – this assertion is contradicted by Plaintiffs' other allegations, as this Court pointed out in dismissing the Prior Complaint. In granting Defendants' motion to dismiss, this Court found that "DNTW did not 'rely solely' on [management's] representations." In re DNTW Chartered Accountants Sec. Litig., 96 F. Supp. 3d at 167. With respect to the $18.8 million "Cash Held in Trust" asset, for example, this Court found – based on Plaintiffs' allegations – that "(1) DNTW would not permit Subaye to carry these funds as cash on its balance sheet absent corroborating documentation; and (2) as a result of DNTW's apparently persistent questions, the alleged $18.8 million asset was converted to an expense." Id.

      The Amended Complaint provides new evidence that DNTW did not rely exclusively on representations made by Subaye's management: according to Plaintiffs, DNTW's work papers show that on November 19, 2010, DNTW sent out accounts receivable confirmations to independent parties. (Am. Cmplt. (Dkt. No. 33) ¶ 61) Acknowledging that in 2009 DNTW began obtaining bank statements from management, the allegations of the

Amended Complaint – when considered as a whole – do not demonstrate that DNTW "relied almost exclusively" on Subaye's representations.[7]  (See Am. Cmplt. (Dkt. No. 33) ¶¶ 6, 10)

With respect to the SEC's findings concerning deficiencies in DNTW's audits – including violations of PCAOB standards (see id. ¶¶ 40-44) – this Court recognizes that Plaintiffs can make use of such material in attempting to plead scienter. See, e.g., Vanleeuwen v. Keyuan Petrochemicals, Inc., 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("'[T]here is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA'. . . . Plaintiffs appropriately relied on the SEC complaint in pleading scienter. . . ." (quoting In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012))); S.E.C. v. Lee, 720 F. Supp. 2d 305, 341 (S.D.N.Y. 2010) (same). The fact that this Court can consider information drawn from the SEC's cease and desist order does not mean, of course, that such information will necessarily be sufficient to establish scienter. See Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 748 (9th Cir. 2008) (finding that settlement agreements with SEC "were not sufficient to meet [scienter] pleading requirements").[8]

---

[7] Similarly, while Plaintiffs complain that Defendants should have exercised greater supervision over the China-based assistants (Am. Cmplt. (Dkt. No. 33) ¶ 46), the fact that DNTW employed China-based assistants tends to undercut Plaintiffs' criticism that Defendants' audits were deficient because DNTW had no Chinese-speaking auditors on staff. (Id. ¶ 10)  Based on the allegations of the Amended Complaint, it is apparent that Defendants attempted to mitigate the lack of Chinese-speaking staff auditors by hiring Chinese assistants in China, where Subaye purportedly conducted its business.

[8] Plaintiffs cite Omanoff v. Patrizio & Zhao LLC, 2015 WL 1472566, at *5 (D.N.J. Mar. 31, 2015) for the proposition that an SEC regulatory action premised on negligent conduct can be relied on by private plaintiffs attempting to plead scienter.  (See Pltf. Br. (Dkt. No. 52) at 26)  In Omanoff, however, the court did no more than reject defendants' argument that the SEC's negligence-based action established that the defendants had not committed fraud. See Omanoff, 2015 WL 1472566, at *5 ("Defendants argue that the SEC's initiation of an action against [Defendants] premised upon negligence, not fraud, demonstrates that Defendants did not engage in fraud. Defendants fail, however, to provide the Court with any authority supporting the

21

Here, the SEC's cease and desist order lists several deficiencies in DNTW's audits. The factual findings in the cease and desist order mirror – rather than supplement – Plaintiffs' allegations in the Amended Complaint, however.[9] Moreover, in discussing the legal standards that Bryce and Spence Walker violated, the SEC's order indicates that the two men committed either "intentional or reckless [conduct]" or "negligent conduct." (Am. Cmplt. (Dkt. No. 33), Ex. 1 ¶¶ 33-35) Given that negligent conduct does not meet the standard for conscious misbehavior or recklessness, see S. Cherry St., LLC, 573 F.3d at 109, the SEC's cease and desist order does not establish that Defendants acted with scienter.

In dismissing the Prior Complaint, this Court found that Plaintiffs had "plead[ed] ample facts demonstrating that DNTW was negligent." In re DNTW Chartered Accountants Sec. Litig., 96 F. Supp. 3d at 167. The new allegations in the Amended Complaint continue in this same vein. The deficiencies in DNTW's audits are not so severe, however, that they constitute "'pretend' audit[s] – . . . audit[s] that in effect w[ere] not performed at all." In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d at 248 (citing Rothman, 220 F.3d at 98). Nor do the deficiencies suggest "deliberate illegal behavior" by DNTW. In re China Organic, 2013 WL 5434637, at *10.

---

proposition that a private party may only bring a Section 10(b) claim against an accounting firm if the SEC first initiates an action sounding in fraud.").

[9] The SEC's cease and desist order cites the following facts, all of which Plaintiffs have pled in the Amended Complaint: (1) the $8.1 million asset labeled "Deposits for Purchase of Inventoriable Assets"; (2) the $18.8 million "Cash Held in Trust" asset; (3) the inadequate supervision of China-based assistants; (4) bank statements obtained from management rather than the bank; (5) the inconsistency in witness accounts as to whether DNTW or the China-based assistants were responsible for handling accounts receivable confirmations; (6) the $6.7 million in cash received at the end of fiscal year 2010; and (7) the receipt of ten accounts receivable confirmations within eleven days after the requests for confirmation were sent out. Compare Am. Cmplt. (Dkt. No. 33), Ex. 1, ¶¶ 1-32) with id., ¶¶ 8-9, 46)

The inference that DNTW was engaged in deliberate illegal activity or acted with recklessness approximating an intent to aid Subaye's fraud is not as compelling as the competing inferences. It is more plausible that DNTW was itself fooled, or that it simply performed shoddy, negligent audits. Accordingly, Plaintiffs have not sufficiently alleged scienter. See Tellabs, 551 U.S. at 314 ("To qualify as 'strong' within the intendment of [the PSLRA], . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."); see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). Plaintiffs' Section 10(b) claim will be dismissed.[10]

## III.     CONTROL PERSON LIABILITY

The Amended Complaint includes a claim for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities law." Rombach, 355 F.3d at 177–78. Because this Court finds that Plaintiffs have not adequately pled a violation of the securities laws, their Section 20(a) claim will be dismissed.

---

[10] Having found that Plaintiffs have not sufficiently alleged scienter, this Court does not reach the issue of whether the Amended Complaint adequately pleads a misrepresentation by DNTW.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to terminate the motion (Dkt. No. 47) and to close this case.

Dated: New York, New York
March 21, 2016

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

24